United States District Court
Southern District of Texas
**ENTERED**
January 28, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| TOKIO MARINE SPECIALTY INSURANCE COMPANY, | § § § § § | |
| Plaintiff. | § § | |
| VS. | § § | CIVIL ACTION NO. 4:20-cv-01523 |
| FLOW-CHEM TECHNOLOGIES, LLC, et al., | § § § § | |
| Defendants. | § | |

## **MEMORANDUM AND RECOMMENDATION**

Pending before me are three motions for summary judgment: (1) Tokio Marine Specialty Insurance Company's Motion for Summary Judgment (Dkt. 34); (2) Flow-Chem Technologies, LLC's Motion for Partial Summary Judgment (Dkt. 33); and (3) Aspen Specialty Insurance Company's Motion for Partial Summary Judgment (Dkt. 36). After carefully reviewing the motions, the parties' briefing, and the applicable law, I recommend that Tokio Marine Specialty Insurance Company's Motion for Summary Judgment be **GRANTED in part** and **DENIED in part**, Flow-Chem Technologies, LLC's and Aspen Specialty Insurance Company's Motions for Partial Summary Judgment be **DENIED**, and all claims against Tokio Marine Specialty Insurance Company be **DISMISSED WITH PREJUDICE**.

## **BACKGROUND AND PROCEDURAL HISTORY**

Flow-Chem Technologies, LLC ("Flow-Chem") owns and operates a chemical blending facility in Rayne, Louisiana (the "Rayne Facility"). In January 2018, through a process of mergers and acquisitions, Flow-Chem became a wholly owned subsidiary of Dorf Ketal Chemicals, LLC ("Dorf Ketal").

A. **THE INCIDENT**

In May 2018, a fire broke out at the Rayne Facility during the transfer of mineral spirits from a tote tank to a 550-gallon stainless steel tank. The fire resulted in on- and off- site contamination, namely the release of other chemicals located at the Rayne Facility (on-site) and chemical-contaminated water migration (off-site). All said, Flow-Chem has incurred millions of dollars in environmental remediation expenses and faces at least three lawsuits in Louisiana state court for personal injuries and other losses resulting from the incident.

B. **THE INSURANCE POLICIES**

Before it was acquired by Dorf Ketal, Flow-Chem obtained primary and excess general liability and environmental exposure insurance policies from Aspen Specialty Insurance Company ("Aspen"). It is undisputed that the Aspen policies were in effect at the time of the May 2018 incident.

In September 2017, Tokio Marine Specialty Insurance Company ("Tokio Marine") issued a premises environmental insurance policy to Dorf Ketal and its subsidiaries. The Tokio Marine policy provided coverage for environmental liability and remediation expenses from September 2017 through September 2021 at specific locations that Dorf Ketal had *identified and included* in the policy.

Relevant here, the Tokio Marine policy provided up to $10 million in coverage for bodily injuries, property damage, and remediation expenses resulting from contamination "on, under[,] or migrating from" two distinct types of properties: (1) "your insured locations"; and (2) "non-owned locations" or "scheduled non-owned locations." Dkt. 33-2 at 16–17, 44. For ease of reference, I refer to the second type of property as "scheduled non-owned locations" throughout this decision. The Tokio Marine policy included separate schedules for each type of property, listing two "your insured locations" and 14 "scheduled non-owned locations." It is undisputed that the Tokio Marine policy identified the Rayne Facility as a "scheduled non-owned location." *See id*. at 46.

### C. THE COVERAGE DISPUTE

Following the fire at the Rayne Facility, Aspen assumed coverage under a reservation of rights. To date, Aspen has spent "millions of dollars for on-site and off-site remediation and property damage and defending [Flow-Chem] against several [state-court] lawsuits arising out of the May 2018 explosion." Dkt. 36 at 2. Specifically, Aspen claims it has exhausted the $1 million primary policy liability limit for on-site remediation and incurred over $2 million in additional off-site and litigation-related expenses under the excess policy. *See id.* In addition, Flow-Chem alleges that its unreimbursed on-site remediation expenses exceed $2.5 million.

Flow-Chem timely demanded coverage under the Tokio Marine policy for expenses and costs not covered under either of Aspen's insurance policies. Tokio Marine denied coverage, citing the policy's distinction between "your insured locations" and "scheduled non-owned locations." It is Tokio Marine's position that premises environmental coverage for scheduled non-owned locations applies only to "a site that is not owned, leased, managed or operated" by Dorf Ketal or its "parent, subsidiaries or affiliates." Dkt. 33-2 at 44. Tokio Marine contends Dorf Ketal's acquisition of Flow-Chem as a subsidiary effectively voided the policy's coverage with regard to the Rayne Facility.

For years, the parties attempted to resolve their dispute without court intervention. However, in April 2020, after settlement discussions fell through, Tokio Marine filed the underlying declaratory judgment action against Flow-Chem and Aspen. Tokio Marine seeks declarations that it owes no defense, indemnity, or other insuring obligation to Flow-Chem in connection with the May 2018 incident and that Aspen has no right of reimbursement or contribution for any payments Aspen has made or will make under its primary and excess policies with Flow-Chem.

Flow-Chem counterclaimed for a declaration that Tokio Marine is legally obligated to defend and indemnify Flow-Chem for remediation expenses, property damage, and personal-injury claims resulting from the May 2018 incident. Flow-

3

Chem also asserts a breach-of-contract claim to recover over $2.5 million in remediation expenses.

Aspen has also filed a counterclaim. Relevant to the underlying motions, Aspen seeks similar declaratory relief regarding Tokio Marine's obligations to defend and indemnify Flow-Chem for remediation expenses and defense costs.[1]

### D. THE MOTIONS BEFORE THE COURT

On April 9, 2021, Flow-Chem filed a motion for partial summary judgment, requesting that the Court rule on "two threshold issues" regarding coverage: (1) whether Flow-Chem qualifies as an "insured" under the insurance policy issued by Tokio Marine; and (2) whether the policy provides coverage for remediation expenses related to environmental contamination at Flow-Chem's Rayne Facility. *See* Dkt. 33 at 3–4. Aspen has since joined Flow-Chem's motion for partial summary judgment and adopted its arguments. *See* Dkt. 36.

Also on April 9, 2021,[2] Tokio Marine filed its own motion for summary judgment, in which it similarly asks the Court to decide "[w]hether the Tokio Marine insurance policy provided coverage to Flow-Chem for the fire at the Flow-Chem location in Rayne, Louisiana due to any ambiguities in the policy." Dkt. 34 at 4. Tokio Marine argues that if the policy provides no coverage to Flow-Chem, then the Court must find that it has no "resulting rights, obligations or duties" to Flow-Chem or Aspen "for any clean-up and remediation costs or for the defense

---

[1] Aspen also seeks a declaration that Tokio Marine is contractually obligated to share in indemnity and defense costs. To that end, Aspen brings a claim for contribution and reimbursement related to expenses—both remediation and defense costs—it has incurred or will incur on Flow-Chem's behalf. Because I find the issue of whether Tokio Marine owes Flow-Chem any duty dispositive, I do not reach these arguments.

[2] Flow-Chem and Aspen argue—correctly so—that Tokio Marine "filed its own summary judgment motion without permission under the Court's pre-motion requirements." Dkt. 48 at 3. Accordingly, they request that the Court strike Tokio Marine's motion "both for its substantive deficiencies and for Tokio Marine's failure to follow the Court's pre[-]motion requirements." Dkt. 38 at 3 n.1. *See also* Dkt. 37 at 2 n.3. Given that Tokio Marine's summary-judgment motion seeks what is essentially the inverse of the relief sought by Flow-Chem, I see no reason to apply such a draconian reading of the Court's Procedures.

4

and indemnification of any lawsuits related to, caused by or arising from the Fire." *Id.* at 20–21.

## LEGAL STANDARDS

A. **SUMMARY JUDGMENT**

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the nonmovant. *See Rodriguez v. Webb Hosp. Corp.*, 234 F. Supp. 3d 834, 837 (S.D. Tex. 2017).

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once satisfied, the burden shifts to the nonmovant to show the existence of a genuine fact issue for trial. *See id.* at 324. To do so, the "nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim." *Brooks v. Houston Indep. Sch. Dist.*, 86 F. Supp. 3d 577, 584 (S.D. Tex. 2015). The same standard applies to motions for partial summary judgment.

In ruling on a motion for summary judgment, I must construe "the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Cadena v. El Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020). On cross-motions for summary judgment, I review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party. *See Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

B. **RULES OF CONTRACT INTERPRETATION**

Because this is a diversity case, Texas's rules of contract interpretation apply.[3] *See Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004). "The primary

---

[3] The Tokio Marine policy does not contain a choice-of-law provision.

5

concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument." *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). Terms are given their "ordinary and generally accepted meaning unless the contract directs otherwise." *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017). Courts must also "examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). *See also Heritage Res., Inc. v. NationsBank, Co.*, 939 S.W.2d at 121 ("We presume that the parties to a contract intend every clause to have some effect.").

When considering the propriety of a grant of summary judgment in a case involving the construction of an insurance policy, courts must determine whether the applicable terms of the policy are ambiguous. *See Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co.*, 99 F.3d 695, 700 (5th Cir. 1996). The determination of ambiguity is a question of law. *See State Farm Lloyds v. Page*, 315 S.W.3d 525, 527 (Tex. 2010).

If the language lends itself to a clear and definite legal meaning, the contract is not ambiguous, and courts must enforce it as written. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). "If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous." *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). Where a policy is ambiguous or susceptible to more than one reasonable interpretation, "Texas courts apply the construction which favors the insured and permits recovery." *Harbor Ins. Co. v. Trammell Crow Co.*, 854 F.2d 94, 99 (5th Cir. 1988). An ambiguity does not arise merely because a party offers a conflicting alternative interpretation, *see Great Am. Ins.*, 512 S.W.3d at 893, nor does the parties' disagreement about the policy's meaning create an ambiguity. *See Kelley-Coppedge, Inc.*, 980 S.W.2d at 465. Rather, "[o]nly when, after applying the

applicable rules of construction, a contract term is susceptible of two or more reasonable interpretations will the term be ambiguous." *Id.*

Put simply, I must resolve all doubts about coverage in favor of coverage "only when the terms of the contract of insurance are susceptible to several reasonable constructions." *Ranger Ins. Co. v. Bowie*, 574 S.W.2d 540, 542 (Tex. 1978). "When there is no ambiguity, it is the court's duty to give the words used their plain meaning." *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984).

### 1. Duty to Defend

An insurer has two separate and distinct duties to its insured under Texas law—a duty to defend and to indemnify. *See King v. Dall. Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002).

To determine whether an insurer has a duty to defend, Texas courts follow the eight-corners rule. *See GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 307 (Tex. 2006). The eight-corners rule provides that "[a]n insurer's duty to defend is determined solely by the allegations in the pleadings and the language of the insurance policy." *King*, 85 S.W.3d at 187. The court's inquiry, therefore, is focused on the alleged facts within the four corners of the live pleading and the plain language within the four corners of the insurance policy.[4] *See Northfield Ins. Co. v. Loving Home Care Inc.*, 363 F.3d 523, 531 (5th Cir. 2004).

The insured bears the initial burden of showing that a claim against it is potentially covered by the insurance policy. *See id.* at 528. "If a complaint potentially includes a covered claim, the insurer must defend the entire suit." *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 491 (Tex. 2008).

---

[4] In 2020, the Texas Supreme Court, for the first time, recognized a limited exception to the eight-corners rule. *See Loya Ins. Co. v. Avalos*, 610 S.W.3d 878, 882 (Tex. 2020). The collusive-fraud exception is not applicable to the case at bar.

7

If the insurer relies on a policy exclusion to deny coverage, "the insurer bears the burden of showing that the plain language of a policy exclusion or limitation allows the insurer to avoid coverage of all claims." *Northfield*, 363 F.3d at 528. To assess the applicability of policy exclusions, courts "interpret the complaint liberally and construe the exclusion narrowly, resolving any ambiguity in favor of the insured." *City of Coll. Station v. Star Ins. Co.*, 735 F.3d 332, 337 (5th Cir. 2013). If the construction urged by the insured is reasonable, courts must adopt that construction, even if the construction urged by the insurer appears more reasonable or to more accurately reflect the parties' intent. *See Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 666 (Tex. 1987). However, rules favoring the insured only apply when the policy is ambiguous; if the exclusion at issue is susceptible to only one reasonable construction, then the insured is afforded no deference. *See Canutillo Indep. Sch. Dist.*, 99 F.3d at 701.

### 2. *Duty to Indemnify*

Generally, the duty to indemnify is decided after the underlying liability case is concluded. However, "the duty to indemnify is justiciable before the insured's liability is determined in the liability lawsuit when the insurer has no duty to defend *and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify*." *Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997).

## ANALYSIS

**A.   THE TOKIO MARINE POLICY**

As mentioned, Tokio Marine's policy provided premises environmental coverage for two types of properties—"your insured locations" and "scheduled non-owned locations." Under the plain terms of the policy, only those locations specifically identified were entitled to coverage.

Remediation coverage for "your insured locations" broadly provided that Tokio Marine will pay for both on- and off-site "**remediation expenses** resulting from **contamination** on or under **your insured location**." Dkt. 33-2 at 16. The

policy defined "your insured location" to mean "any property or location approved by use and listed in . . . [the] Your Insured Location Schedule endorsed to this policy." *Id.* at 20. The policy subsequently identified two "your insured locations," both of which are located in Texas. *See id.* at 34.

At first glance, the policy's language regarding remediation coverage for scheduled non-owned locations appears similarly broad:

> We will pay for **loss** or **remediation expense** that the **insured** becomes legally obligated to pay as a result of a **claim** for **bodily injury**, **property damage** or **remediation expense** arising out of **contamination** on, under or migrating from a **non-owned location** or **scheduled non-owned location**[.]

*Id.* at 44. However, "scheduled non-owned location" is defined as "a site that is not owned, leased, managed or operated by you, your parent, subsidiaries or affiliates ***and*** scheduled to this policy in this endorsement." *Id.* (emphasis added). Thus, unlike "your insured locations," the policy excluded coverage if a "scheduled non-owned location" was "owned, leased, managed or operated" by Dorf Ketal or its "parent, subsidiaries or affiliates." *Id.*

B. THE RAYNE FACILITY IS NOT COVERED UNDER THE TOKIO MARINE POLICY

Generally, when an insurer and its insured square off, the insured opens in Vegas as a prohibitive favorite. But if the policy is unambiguous, then all bets are off. Here, the policy is unambiguous, and the applicable rules of construction yield only one reasonable result.

Let me begin with where Flow-Chem[5] and I agree. Flow-Chem argues that, as a subsidiary of Dorf Ketal, it is entitled to the same protections the "insured" enjoys. I agree that the policy is ambiguous with regard to whether Flow-Chem qualifies as an insured, which is defined as "[t]he named insured and any subsidiary thereof." Although Dorf Ketal identified only one subsidiary in its

---

[5] For ease of reference, I refer only to Flow-Chem, even though Aspen has joined Flow-Chem's motion and adopted its arguments. *See* Dkt. 36 at 2.

application for premises environmental coverage, *see* Dkt. 35 at 100, Flow-Chem became a Dorf Ketal subsidiary shortly after the Tokio Marine policy was issued. Reading the term "insured" broadly and in favor of coverage, the definition's inclusion of the phrase "any subsidiary" without any condition or limitation arguably includes Flow-Chem. However, whether Flow-Chem qualifies as an insured under the policy is a complete red herring.

Instead, the salient fact in this case is that the Tokio Marine policy expressly identified the Rayne Facility as a "scheduled non-owned location." The policy defined "scheduled non-owned location" to mean "a site that is not owned, leased, managed or operated by you, your parent, subsidiaries or affiliates ***and*** scheduled to this policy in this endorsement." Dkt. 33-2 at 44 (emphasis added). The use of the conjunctive "and" demonstrates two separate requirements. *See Velazquez v. Countrywide Home Loans Servicing, L.P. (In re Velazquez)*, 660 F.3d 893, 897 (5th Cir. 2011) ("[T]he word 'and' is often construed as conjunctive."). That is, simply identifying the Rayne Facility as a scheduled non-owned location is not enough to ensure coverage. The policy also required that neither Dorf Ketal nor its "parent, subsidiaries or affiliates" own, lease, manage, or operate the scheduled non-owned location. Flow-Chem not only concedes but readily and repeatedly argues that it is a subsidiary of Dorf Ketal.

Without addressing this seemingly insurmountable issue, Flow-Chem insists that the policy "does not contain any language or conditions indicating that coverage is lost for a scheduled [non-owned] location if the owner or operator of the property becomes a subsidiary of the named insured after inception of the policy." Dkt. 33 at 13. However, this sophistry conveniently ignores the policy's definition of "scheduled non-owned location."

This decision is so cut-and-dried that I felt I must be missing something, but I am not. I have carefully reviewed the parties' briefing. At no point does Flow-Chem attempt to synthesize its position with the policy's unambiguous language limiting premises environmental coverage for "scheduled non-owned locations"

10

that are owned, leased, managed, or operated by Dorf Ketal or its subsidiaries. Instead, Flow-Chem attempts to avoid the policy's inconvenient language by opaquely referring to the Rayne Facility as "an insured location under the policy." Dkt. 33 at 1. The delusive term "insured location" does not hide the weakness of Flow-Chem's legal argument.

Although insurance policies are construed strictly in favor of the insured in order to avoid exclusion from coverage, this rule "appli[es] only when the terms of the contract of insurance are susceptible to several reasonable constructions of coverage." *Ranger Ins. Co.*, 574 S.W.2d at 542. Here, there is only one reasonable construction. Dorf Ketal's acquisition of Flow-Chem as its subsidiary eliminated any coverage the Rayne Facility might otherwise have enjoyed as a "scheduled non-owned location" because the Rayne Facility is "owned, leased, managed, or operated" by a Dorf Ketal subsidiary. To hold otherwise would render meaningless the policy's definition of "scheduled non-owned location." *See Page*, 315 S.W.3d at 527 ("We must read all parts of the contract together, giving effect to each word, clause, and sentence, and avoid making any provision within the policy inoperative.").

C.  **BECAUSE THE RAYNE FACILITY IS NOT COVERED, TOKIO MARINE OWES NO DUTY TO EITHER DEFEND OR INDEMNIFY FLOW-CHEM**

Tokio Marine's summary-judgment motion seeks a sweeping judgment that would effectively dispose of this case, asking me to find "that the Tokio Marine policy provides no coverage to Flow-Chem (and no resulting rights, obligations or duties to Aspen) for any clean-up and remediation costs or for the defense and indemnification of any lawsuits related to, caused by or arising from the Fire." Dkt. 34 at 20–21. Flow-Chem's and Aspen's motions for partial summary judgment focus on the question of coverage, ostensibly leaving disposition of their respective claims against Tokio Marine for a later date.[6] At the end of the day, all three parties

---

[6] Tokio Marine seeks a declaration that the policy "provides coverage for remediation expenses arising from environmental contamination at the [Rayne Facility]," Dkt. 33 at

ask the same question: Does Tokio Marine owe Flow-Chem any duty—defense, indemnification, remediation, or otherwise—for damages resulting from the May 2018 incident? If the answer is no, then Flow-Chem's breach-of-contract claim fails, as does Aspen's claim for reimbursement or contribution.

The eight-corners rule governs my duty-to-defend analysis. *See GuideOne Elite Ins. Co.*, 197 S.W.3d at 307. However, facts, not allegations, determine an insurer's duty to indemnify. *See D.R. Horton-Texas, Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 744 (Tex. 2009). Generally, courts wait until after the underlying litigation is concluded to decide whether an insurer owes a duty to indemnify. However, if "the insurer has no duty to defend *and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify*," then I can decide the indemnity issue at this juncture in the proceedings. *Griffin*, 955 S.W.2d at 84. The *Griffin* exception applies if, under the facts pleaded, "it would [be] impossible for the insured defendant to show by extrinsic evidence that the loss fell under the terms of the policy." *Burlington N. & Santa Fe Ry. Co. v. Nat'l Union Fire Ins. Co.*, 334 S.W.3d 217, 220 (Tex. 2011).

Tokio Marine has submitted the live petitions from four state-court lawsuits, three of which were still pending at the time Aspen filed its counterclaim. Based on the pleaded facts, there is no *prima facie* showing that the state-court plaintiffs' claims seek damages for an event that is potentially covered under Tokio Marine's policy. *See* Dkt. 1-3 at 4 (alleging plaintiffs "were injured as a result of their exposure to the various chemical compounds of which they were not warned . . . resulting from the fire at [Flow-Chem's Rayne Facility]"); Dkt. 1-4 at 2 (claiming plaintiffs were injured by "a fire and explosion [that] erupted at Flow-Chem"); Dkt. 1-5 at 3 (asserting a litany of claims for "damages caused by the explosion"); Dkt. 1-6 at 2–3 (alleging business interruption due to the "chemical explosion" at the Rayne Facility). Flow-Chem has failed to carry its initial burden of establishing that

---

15, while Aspen asks for a declaration that the policy "provides coverage for the costs and expenses arising out of the May 2018 fire and exposition." Dkt. 36 at 3.

coverage exists. Accordingly, I recommend summary judgment be granted in Tokio Marine's favor on the duty-to-defend issue.

Moreover, it is abundantly clear that no "conceivable set of facts" can be developed in the state-court lawsuits that could possibly trigger coverage because the injuries all stem from an incident that occurred at a property not covered by the underlying insurance policy. *See D.R. Horton-Texas*, 300 S.W.3d at 745. "Because the insurance coverage does not apply, there can be no duty imposed on [the insurer] to indemnify its insured." *W. Heritage Ins. Co. v. River Ent.*, 998 F.2d 311, 315 (5th Cir. 1993). Put differently, the same reason that conclusively negates Tokio Marine's duty to defend Flow-Chem likewise negates any possibility Tokio Marine will ever have a duty to indemnify. Accordingly, summary judgment on the question of indemnity is also appropriate.

D. **FLOW-CHEM'S AND ASPEN'S REMAINING COUNTERCLAIMS SHOULD BE DISMISSED**

Flow-Chem's breach-of-contract claim is premised on Tokio Marine's "fail[ure] to provide defense and indemnity." Dkt. 14 at 10. Because the policy does not cover the Rayne Facility, Tokio Marine, as a matter of law, cannot be found to have breached the insurance agreement. *See Mt. Hawley Ins. Co. v. Huser Constr. Co.*, No. CV H-18-0787, 2019 WL 1255756, at *9 (S.D. Tex. Mar. 19, 2019), *aff'd*, 797 F. App'x 183 (5th Cir. 2020) (finding that, where there is no duty to defend, the insured's "breach of contract and insurance law counterclaims predicated on [the insurer's] failure to defend . . . also fail"); *St. Paul Fire & Marine Ins. Co. v. Riley Expl., LLC*, No. 3:16-CV-1437-C, 2017 WL 3841606, at *5 (N.D. Tex. Feb. 17, 2017) ("[T]here can be no breach of the insurance contract if coverage is barred by the exclusion at issue.").

Likewise, Aspen's claim for reimbursement or contribution fails because it is based on the faulty premise that the injuries Aspen has provided coverage for under its insurance policies with Flow-Chem are also covered by the Tokio Marine policy.

### E. ATTORNEY'S FEES

In its motion for summary judgment, Tokio Marine includes a one-sentence request for reasonable attorney's fees. *See* Dkt. 34 at 21. Tokio Marine offers no basis that would entitle it to such relief.

"Except as otherwise specifically provided by statute," Congress generally bars the recovery of attorney's fees and expenses. 28 U.S.C. § 2412(d)(1)(A). For claims brought under the Declaratory Judgment Act, "attorney's fees are recoverable . . . only where they are recoverable under non-declaratory judgment circumstances." *Mercantile Nat'l Bank v. Bradford Tr. Co.*, 850 F.2d 215, 216 (5th Cir. 1988). Here, no "non-declaratory judgment circumstance" exists; Tokio Marine has pled a single claim for declaratory relief and does not claim a contractual right to recover its attorney's fees under the insurance agreement.

Absent contractual or statutory authority, the only exception that could apply here is the bad-faith exception. "Attorney's fees may be awarded to a successful litigant when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Rogers v. Air Line Pilots Ass'n, Int'l*, 988 F.2d 607, 615 (5th Cir. 1993) (quotation omitted). Tokio Marine never pled bad faith, vexation, wantonness, or oppression. But even if it had, nothing in the record would support such an allegation. Accordingly, Tokio Marine is not entitled to attorney's fees.

\*\*\*

For the foregoing reasons, I recommend that the Court **GRANT in part** and **DENY in part** Tokio Marine Specialty Insurance Company's Motion for Summary Judgment. Specifically, I recommend the Court grant Tokio Marine's request for declaratory judgment as explained above but deny its request for attorney's fees.

I further recommend the Court **DENY** Flow-Chem Technologies, LLC's and Aspen Specialty Insurance Company's Motions for Partial Summary Judgment and **DISMISS WITH PREJUDICE** their remaining claims against Tokio Marine.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have 14 days from the receipt to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED this 28th day of January 2022.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE